Chief Judge Cole is not going to be with us physically, but he will, as I understand it, review the tapes afterwards, right? He's not connected with us right now, is that right? No. So he's not actually listening right this moment, but he will listen carefully to the tapes and our discussion this afternoon. So please call the case. Good afternoon. It's always a privilege for us to be here. I'm Tim Sweeney. I represent Grady Brinkley in this capital habeas case. And I'm going to ask for seven minutes for rebuttal, if I could, please. John Parker, my co-counsel, is here with me. As you know, this is a capital case that arises out of the state of Ohio. We've got an inmate named Grady Brinkley, who was convicted of aggravated murder in 2002 with two capital specifications. What I want to talk about today with the court principally are two issues related to the mitigation ineffectiveness claim. Number one, that this is de novo review, that this court is bound by nothing in connection with 2254D, and the court can look at this anew and arrive at its own decision regarding the merits of this claim. Second, I want to talk about the merits of this claim, both the performance and the prejudice prong. Before jumping into that, though, I think it's appropriate in this case to note the specifications that we're dealing with. We're dealing with two specifications. There's the aggravated robbery spec, and there's the spec concerning the escape detection for the city diner spec. Both of those, as you know from the record and as you know from the COA that this court granted, raise reasonable questions as to whether there's even sufficient evidence as to those specs. So I don't want to go into the merits of that because I think that's fully addressed in the briefs, but I think in terms of understanding and analyzing the mitigation, I think that's important to keep in mind, that the specs here are weak. They're feeble. There's a question here as to really, if you look at this case, why is this a capital case? You know, this is sort of the, you know, I mean, it's an aggravated murder and that's tragic. Nobody denies that, but, geez, the prisons of Ohio are filled with people who aren't on death row who are convicted of having killed a boyfriend or girlfriend because of a lover's fight, which I think is one reasonable way to look at this evidence if people believe Grady Brinkley committed this crime. Yeah, I mean, I fully appreciate your point and I don't quarrel with your statement that these aren't the strongest specs that, you know, we've ever seen. On the other hand, if one says the jury could have accepted these, then it lends a much more cold-blooded rationale to the killing than some, you know, almost second-degree murder sort of I can't believe you cheated on me type of thing. Fair enough, but I think in terms of approaching the analysis and the weighing, which I think is de novo, you do, I think, look at this, I think people coming to this case, certainly I think judges coming to this case, may look at it and say, hey, you know, is this really properly a capital case? I mean, I guess, you know, I could factor in proper in terms of the prejudice, right? I mean, if there were just really, really powerful specifications on these facts, then that would be something that would be part of the prejudice analysis. I think that's right and I think some of this court's opinions do address that. They do look at the specs and they do say, okay, what do we got here? Sometimes it's only one spec, sometimes it's weak evidence of a spec. I think that goes into the weighing. The de novo aspect of this, though, because I think that's critically important in analyzing this. This review is de novo. There is no, and this is important, there is no state court decision that adjudicated the merits of Grady Brinkley's ineffective assistance of counsel and mitigation claim as it was presented in federal court, which is an outside-the-record claim reliant on substantial evidence that wasn't available in the direct appeal. I know this is set out in the briefs, but I think, and I think you know from the briefs, that this is kind of a critical point in the analysis. Is there a state court decision that adjudicated this? Now, the answer here is no. We know that the direct appeal, there was a variant of an ineffective assistance claim presented to the Ohio Supreme Court and they rejected it. They considered that claim and they rejected it. That claim is not before us. That claim is not before us. We have a different claim before us. That claim, that claim was done with in the Ohio Supreme Court. Now we have a different claim in post-conviction. It was properly presented in post-conviction. It was supported with all the evidence outside the record that was unavailable in the direct appeal, including the affidavit of Dr. Robert Smith, the psychologist, critically important evidence on this record in our view, including the testimony of Dr. Douglas Smith, who wasn't presented in the trial, the evidence of Quince Brinkley, the cousin, the evidence of Mrs. Brinkley's sister-in-law, the evidence of federal judge, now federal judge, Jeff Helmick. You're talking now about the robbery aggravator and the escape detection aggravator. No, I'm talking here, Your Honor, about the ineffective assistance of counsel in the mitigation phase of this case. That the claim that was presented here in federal court has never been adjudicated by any state court, and so this court's review is de novo. I think a very helpful way to look at this case was the way this court looked at it in the McGuire decision that you, I know, were involved with, Judge Rogers, where the question was trying to analyze Ohio's res judicata rules and how do they work. And I think this court came to the right answer, which is the answer that the Ohio courts in this case, in Grady's case, got it wrong. There's a variant of res judicata. Res judicata simply doesn't apply to bar the claims that Grady Brinkley presented in state court in post-conviction. It doesn't apply. You laid out, I mean, by definition under Ohio law, he could not have presented a claim, ineffective assistance claim on direct appeal that relied upon evidence beyond the trial record. Right. So, I mean, when the heck is he supposed to, you know, present that claim? Right. He's supposed to present that and we'll hear what the state has to think, but, I mean, that's a rule that's familiar to us, you know, 2255. I mean, we say all day long, you know, bring that one in a 2255. You don't like your lawyer and we're in a direct appeal. Right. It was raised in the direct appeal though. There was a different claim raised in the direct appeal. How different was it? Well, it was different in the sense that it relied and could only rely on the record before the trial court in the direct appeal, which is the trial court. Why could it only rely on it? Because that's the rule that Ohio law has imposed on direct appeal. I understand the Ohio rule. I'm talking about the issues. They did raise the claim. How is it different from the other claim? Well, they raised the claim because you couldn't rely on certain facts. It doesn't make it a different claim, does it? Well, I think there's two points to make. First of all is Ohio was raised. What was raised in the direct appeal was a claim, one sentence. That's all that was said about it, one sentence. The sentence in the direct appeal's brief, in Brinkley's direct appeal brief, there was one sentence to the effect that the lawyers only presented two witnesses and they didn't do enough in mitigation. That's it. That's all they said. And all the trial court, the direct appeal court had before it to adjudicate that. And then the direct appeal court said nothing? The direct appeal court, the Ohio Supreme Court, the only court that was presented with that claim, rejected that claim and said, No, we don't agree. We don't see any evidence that the – I'm trying to think of the underlying reasons for AEDPA, which is deference to the state court. Exactly. The thing isn't ever raised and there's not much to give deference to. But if it's raised, however, briefly and then the state court addresses it with some care, then wouldn't that look into the policies underlying AEDPA that we defer to the state court on these issues rather than the federal court? If all those things happened, that would be the case, but that didn't happen here. But part of it didn't happen. The claim that was presented to the federal court, which is the outside-the-record-based claim of ineffective assistance counsel, was never adjudicated by an Ohio State court. The Ohio Supreme Court did not adjudicate that claim and was incapable of adjudicating that claim because it had none of that evidence. And the Ohio State courts themselves have recognized this is how our rescue – I'm trying to get the distinction between additional evidence for a claim and something being a separate claim because there's additional evidence to support it. Well, I mean, I think – It's kind of a fuzzy distinction there, isn't it? It really isn't. You know why? Judge, here's the other way to look at it, my other point on this. Because Ohio arrest judicata doesn't just say what you did raise. It also says what you could have raised. And so that answer should be the same regardless of how you look at it. You know, you as a judge should be asking me the same questions. Well, what could you have raised in the direct appeal? If you didn't raise it in the direct appeal, well, what could you have raised? And the answer to that is you could have raised the argument that if you look at the trial record, you're going to have – you could come to the conclusion that they were ineffective. You could say, okay, you could have raised that. That claim is barred by arrest judicata. But the different claim, which is the outside-the-record variance, which requires evidence that was never presented and couldn't be presented, wasn't raised, couldn't have been raised, wasn't adjudicated, couldn't have been adjudicated. And the Ohio state courts have said that's how arrest judicata applies. This court, Your Honor, in McGuire, cited a court decision called State v. Richmond, which held just that. You can raise these claims once in direct appeal, and then, if you lose, raise the same ineffective assistance of counsel claim, for example, in mitigation, with additional evidence outside the record, and bring that in post-conviction. And, in fact, you can do that, and not only can you do that, you're supposed to do that. That's the reason. If you just praised it, it's the same claim. So there's a way of using the English language to say that's the same claim. It just had more evidence. That's exactly the way you just praised it. So I'm not seeing why the policy of EDPA suggests that we have to treat it as a different claim. Because, for purposes of arrest judicata, it is a different claim. And that's the legal consequence of that. It is a different claim that has to be raised in post-conviction, and if you're going to defer to the state courts, they've got to roll up their sleeves and they've got to adjudicate that claim. Well, I mean, we just said, and this is really more for the state, I guess, to answer, but we just said in Shepard v. Bagley, which is a case in which the state prevailed, the second one, that some of the claims before us there were different claims for purposes of a habeas statute and therefore second and successive, because we'd already had one round of this, precisely because they relied on evidence that had not been part of the claim that we adjudicated. So I guess that would cut both ways. Our point there is just because it's called ineffective assistance, if I recall, just because it's called ineffective assistance doesn't mean it's the same claim. If you have different theories or different evidence, it's a different claim for purposes of EDPA. And then we kind of go from there in terms of did you exhaust it, could you have raised it earlier. Yeah, and in this case, I think all those questions are resolved in favor of Brinkley, which is to say he couldn't have raised it earlier because it relies on this evidence outside the record. He had to raise it when he did raise it. He raised it in postconviction properly at the first time. It's not like a McGuire case where they raised it in direct appeal and then failed to present any evidence outside the record in postconviction and then tried in the second postconviction petition to now put the evidence in the record. That's different. Brinkley did it right. He raised the outside the record evidence in the first postconviction petition, which is the way you're supposed to do it. He did everything right. Res judicata was incorrectly applied to bar his claim. So you ask the question, the good question. So what are the principles of EDPA? Well, the principles of EDPA say when you incorrectly refuse to consider the merits of the claim because you rely on a procedural rule that doesn't even apply under your own law and you refuse to get to the merits, then there's no comedy interest there to protect. These state courts have to roll up their sleeves and do this the first time. If they do it the first time, if they adjudicate the merits of that claim the first time, then sure, they get deference. We understand that. But if they don't, which is our case, then, no, they don't get deference. That's fair. That's the right result. They should have done it right the first time. Let me ask you one question about the evidence that has been developed over the course of the case. We have a bunch of evidence that is presented in the post-conviction petition in state court, and then we have a lot more testimony from basically the same witnesses in the federal proceeding. The question I have there is why would we be able to consider the federal testimony, not because of what's the name of the case? Finholster. Finholster. Not because of that, but because of 2254E's requirement that basically the petitioner be diligent, which I understand to mean, look, if you could have generated this federal hearing evidence when you were in the state proceedings, then we're not going to consider it. I mean, why couldn't they have gotten this other evidence back when these same folks were testifying in state court? Well, I think that's a good question, and I think the answer here is favorable to Brinkley because what 2254E talks about in terms of this issue is was the petitioner diligent? Right, that's right, Judge Kappel. That's the issue. Was the petitioner diligent? And how do you determine diligence? Did he ask for a hearing? Did he ask for discovery? Did he do the things that a diligent fact finder needs to do to develop the facts? And in post-conviction, he did all those things. He presented the Dr. Robert Smith affidavit. He presented the Dr. Douglas Smith affidavit. He presented records that supported their opinions. He presented affidavits, and he asked for discovery, and he asked for the opportunity to take their depositions, and he asked for the opportunity to develop additional evidence to support it, and he was denied. So he did everything he was supposed to do. What about as to his own witnesses? I mean, so correct me if I'm wrong, but my understanding is post-conviction you've got, what, a bunch of affidavits from, like, Dr. Smith and Dr. Brams and all of these. There was no Dr. Brams in post-conviction, no. Okay. So I guess why wasn't there? I mean, there is Dr. Brams in the federal, right? She's on his side at the outset. I mean, why shouldn't we say, hey, you know, Dr. Brams, you needed to sort of get that together in state court, and you didn't. So as to her, you weren't diligent. I don't think it's a document-by-document analysis. I think it's more of a claim analysis. Was the claim of ineffective assistance of counsel and mitigation presented in the state courts with evidence to support it, which it was, was the petitioner diligent in seeking to further develop that record by, for example, getting permission to take the deposition of Dr. Brams or, for example, getting the permission to develop and put in additional evidence? All those things happened in state court. You know, he presented the evidence of the claim and supported the claim, and then all 2254E requires is that he be diligent and it not be his fault that the records weren't developed. And so I think by putting in the claim, the broad outlines of the claim, with some specificity, there were four sub-claims presented in post-conviction. I think they're claims 5, 6, 7, and 8 in the post-conviction petition. And each of them had these affidavits that you mentioned. Dr. Brams, right, that wasn't one of them. But the notion that there was psychological and psychiatric testimony available was clearly presented. That issue was developed. It was developed with evidence outside the record. And had he been given the hearing in state court that Judge Adams gave him in federal court, you would have had the Jolie Brams evidence then. You would have had the Dr. Amdor report then. You would have had exactly what you ended up with in federal court, had the state court given him what the state court should have done but didn't. So I do think under 2254E he did everything he was supposed to do, and this court can consider all of that. I mean, Cohen v. Pinholster doesn't bar any of it, as you know our position on this, because 2254D doesn't apply. So you get to consider not just... Only E would apply here. Only E would potentially apply, but we think he's through E. I understand. Yeah, I understand. I know the AG has a different view, and we'll hear what they say. It's not like a night and day difference, really. Right. I agree with that. Because I think we win, even if you don't consider Brams, our position. At some point, you should probably tell us why. Yeah, here's why. Somebody's a narcissist isn't really one of the more powerful mitigators I've heard lately. You know, and I think that's a fair initial reaction. But I think what lawyers have a duty to do is not to make just initial reactions when you're representing somebody. I think your duty is to say, okay, narcissistic personality disorder, that's going to present some challenges, but that's an opportunity. It helps explain what happened here. Narcissistic personality disorder is a serious mental health condition. It's very common. I mean, access to ESM-5, narcissistic, I mean, this isn't a unicorn. It's a fox squirrel. I mean, you know, we have the U.S. v. Heard case. You know, lawyers, doctors, judges, you know, candidates for president, presidents. I mean, it is literally, the clinical part, it is so common. The courts have said what I do think, though. But here's the test, though. It's not the test whether it's common. The test is could you have persuaded one jury, one juror, that it made a difference in Grady Brinkley's life. And here's my belief. My belief is that you don't stop just because it's hard, which is what these trial lawyers say. You stop because it's hard. You might stop because it's going to do more harm than good. But here's our take on it, Your Honor. It wouldn't have done more harm than good. An aggressive, effective advocate would have made this his winning argument because you can present Grady Brinkley as the victim of his development. This narcissistic personality disorder is a disabling mental health condition. Simply not disabling. Well, but you would. Simply not disabling. But, Your Honor, that would have been the state's duty to make that argument to a jury. It is simply not disabling. I mean, we're not talking about psychosis. We're not even in, like, the same zip code of psychosis here. Well, but I think we had an expert. It's Dr. Smith who was going to get up and testify, had he been presented to a jury, that this is a serious mental health condition that people have that isn't their fault. See, that's the part of it that gets me. It's not his fault. You don't grow up wanting to be a nurse. This is what bothers me. I mean, I can understand that sort of technically. But this is a lawyer who has to make a judgment as to what's likely to convince a jury. A lawyer's judgment doesn't need to be as educated as my colleague is. A lawyer can say, how's this going to appeal to a jury? I know juries. I may not know psychology a lot, but I know juries. And I'm more likely to get enough sympathy to get that one juror. If they start crying when the mother starts crying, then if I have a psychiatrist up there talking about these technical diseases, which sound even worse than they are, all right? So that's a – I'm trying to see. You're saying we just give one level of deference rather than two. We just give the Strickland deference and not the AEDPA deference. But there's still some deference in there. There is some deference. Judgment of the – I wonder how you respond to that. It has to be a reasons judgment and it has to be based on an investigation. That didn't happen here. Because we don't just have the NPD, the narcissistic. You have the substance abuse disorder. You have the chronic trauma. You have the potential organicity. You know, you have four things. You have four very serious things here. Dr. Smith said there's no organic brain problem. Well, Dr. Smith isn't a neuropsych. But you can understand. I can understand that. I can understand. But, Judge, you've got to persuade one. You've got to try. You've got to try. I mean, there are cases. Well, no. But, I mean, if try means you've got to sort of make the argument, counsel can have a reasonable judgment that this argument is going to do more harm than good. Well, I would submit that that judgment, number one, wasn't informed here. And number two, if that was the judgment, it was wrong. It's not the judgment an effective counsel should make in a case like this where you've got the ability to talk about the substance abuse of a kid who was five years old and was already numbing his pain with drugs and alcohol. That's a shocking fact. Why wasn't that presented? Why wasn't that presented? This kid, from five years old to the time he was imprisoned. You're saying that the lawyers didn't even know. Didn't even know about it. Didn't know about this trauma diagnosis. I mean, they put on some testimony of the mother about the father being shot or stabbed when he was, you know, being, nobody testified about the impact on Grady Brinkley. I mean, this was a kid who had some talent. He had some talent. And if somebody cared about him, he might have become like his cousin, Quince Brinkley, and gotten out of this horrible upbringing he was sort of doomed to endure. He was numbing his pain when he was a teenager all through his life. One juror might have cared about that. Now, maybe they would have said the narcissistic personality disorder doesn't persuade us. But you know what they might have said? They might have said, but it does explain. It explains why this crime happened. It explains, perhaps, why these other crimes happened. I mean, you know, I'm a narcissist, therefore, I mean, I cut this woman's throat and then went off and used her ATM card 16 times the same day. That just doesn't connect. You know what that connects with? And I'm serious here because this was a risk they faced, and this is in the record. It connects with being either a sociopath or a psychopath. And so, I mean, as I'm reading, you know, these notes where the lawyers say, well, I met with Smith or Brahms, I think, or Brahms, like the composer, and, you know, the notes say psychopath. I mean, if you want to start talking about an art, I mean, if I'm the prosecutor and the defense starts talking about narcissism, I say, fine, I'll grant you narcissism. Let's talk about sociopath. You know what that means? Antisocial personality disorder. Here are some characteristics, which, I mean, you can't do this crime unless you have that. You cannot. Anyway, so isn't there a real danger there? I don't think so. I think on this record, you've got to fight for your client. You can't just say your mother loves you. That's never going to work in a Wayne State, particularly not in this case where you have that 911 call. I don't know. I mean, it's never going to work. Hypothetically, you could have a client who's so unsympathetic to the jury that your best chance is just bring in the relatives and just plead for mercy. You could. You can fight for your client. I respect that. You can try to make narcissistic personality disorder an explanation for this. I mean, it's worked in other cases. There's other court decisions. I mean, it's really not that much different from PTSD. The problem is people don't like narcissists. They don't like them because they do bad things. I know, but what difference does it make if the trauma that impacts you comes from the fact that you grew up on the streets of Chicago with a parent that didn't love you and didn't care and you were abusing drugs or that you became that way because you fought in Vietnam? Why should that matter? They're focused on the substance abuse without getting into all that narcissism stuff? Or would that have worked? They may have been able to do that. Just talk about substance abuse as a possible mitigating factor. I think you've got three or four things they missed here. I think any one or two of them would have brought the weighing because you only got to convince one. It's not insurmountable. If you thought one of them was counterproductive, could you have done the other without having the counterproductive one? I think you could have. You could have. You could have made a better. The problem is they did not make an informed decision. I think they heard narcissist and they said, that's too hard, we don't do hard. We're not going to work hard for this guy. You've got to work hard for this guy. They didn't do that. Just a factual question. I mean, as I understand the record here, how do you pronounce it, Desch? Beck. Beck. Beck and Thebes each meet with Smith, right? I don't think so. I think Thebes' testimony, Your Honor, was he had nothing to do with the mitigation. It was Dech. Dech meets with Brams. Dech spoke on the phone with Brams. Brams was retained by Wingate and Cameron. I understand that history. Okay, so they talk on the phone, and according to Dech, Brams herself says this guy's mental history is not very helpful. I believe you're right. That's Dech's recollection. Now, Brams has a different recollection, which I'm sure you'll see. Right. Her testimony is, I never reached any diagnosis, and I saw a lot of problems here and I saw a lot to work with. That's what she said. You're right, though. That is what Dech said. But Thebes also testifies about what Brams said. But I don't think he knows what Brams said firsthand. I think he was testifying about what he heard. My recollection, Judge Kethledge, is that Thebes' testimony was pretty clear that he didn't have anything to do with the mitigation. That was Dech's job. But that's not to say he didn't have knowledge that he shared in his deposition, but I don't believe that knowledge was firsthand. Did Dech talk to Smith, right? Dr. Douglas? Dech is the one that hired Doug Smith. Doug Smith was the MD psychiatrist. Right. Who had never done a capital case before. Okay. Yeah, I know. Dech retained. But you need some guidance. You need to be told what's mitigation. None of that happened. But they do talk. They did talk. He introduced them to Brinkley. Dr. Douglas Smith interviewed Brinkley and had some ideas and then didn't hear back. I guess, and I'm just trying to make sure I understand the facts. I mean, it wasn't like there was a total failure to look into, a total dereliction in examining some of these things. I mean, you know, Dech does talk to Brams. He does have Smith. He talks with Smith. I mean, he does spend five hours visiting with the family in Chicago. I mean, that's not de minimis. Why is that just, you know, as a matter of law, I guess, just an inadequate investigation? I think the proof is in the pudding. But I do think that's inadequate. I think that's a good first step, meeting for a few hours. I think it was three, maybe. My recollection is three, whatever. But I think that's a good first step. You meet with them all together. But then you've got to spend a lot more time. You've got to. Do what? I mean, this is a real simple mitigation theory. I mean, that's partly your point, right? It's really simple. Go in there and just, you know, make the jury understand how painful this is going to be for you. He doesn't have a duty to coach them about that. No, but I think he needs to understand. I mean, they would have opened up perhaps. Here's one example. You know, you've got to build trust, certainly with the mother, certainly with the family. I mean, they maybe perhaps at one point then would open up about the substance abuse. They never did. These guys didn't even know about it. They didn't even know about it. I mean. You know, you've got to do that. That's what an effective mitigation is. It's not three hours. With all due respect, Your Honor, it's not sufficient to spend three hours with the family and think that's good enough for mitigation in a capital case. That may have been okay back in the 1980s, but these guys go to these seminars. They hear what they're taught. They know they're supposed to do more than that. They know that. They know they're supposed to catch. What would be the case you would point us to that says that amount of investigation is inadequate? I think the ABA, frankly, that's not terribly persuasive. Guidelines? What the Sixth Amendment means. I mean, what case supports your argument that the investigation. . . Rompilla. I'm sorry? I'll go to Rompilla, which is the United States Supreme Court. Rompilla? Rompilla, R-O-M-P-I-L-L-A. There they did. . . You know what they did there, Your Honor? They spoke to the defendant, five family members, and they spoke to three mental health witnesses. That wasn't enough because they missed so much. That's a good first step. They did a whole lot in Rompilla. They did. I don't think they missed all that much more than here. I mean, I think it becomes a matter of piece. I mean, I really think if you took Borderline Personality. . . It's not Borderline Personality. Borderline's a lot worse. NPD. Way worse. I don't remember what it was in Rompilla, but I remember reading it that it was a whole lot of stuff. Well, I mean, I guess some of the. . . Yeah. Yeah. I mean, sometimes. . . I don't think so. I really don't. I think these things become matters of degree, and I think if the standard is one juror, one juror, I think, boy, I tell you what, I think finding a mental health diagnosis, even if it's access to, is a big deal. I think it's a big deal. It's a big deal in a case like this. Having substance abuse disorder, combining with it, even a bigger deal. Having the history of trauma, even better. Those are. . . And having a family that loves you. There you go. And having the potential organanic component. You've got something to fight with. You've got to get up and fight. That's your duty. That's what the Sixth Amendment says. It doesn't say you can hear narcissism. That's tough. That's going to be hard. We're giving up. We're just going to put on a mother that says he loves them. No, that's never going to work in a weighing state. You've got to out. . . I'm sorry? That's the words you're putting on it. That's my. . . They didn't get into it because it was hard. Well, I think that's a fair inference from the evidence, that they didn't want to do it because it's too hard. I don't. . . I think it's just. . . I think it's just. . . At least as I understand what they're reasoning, it just misstates things slightly. It's not that it's hard. It's that it's likely to be, in their judgment, counterproductive. Do you really think. . . My view for the record is they didn't know enough about it to even be able to say it would be counterproductive. They heard narcissism. I don't think they had a working knowledge of it. They have to know what it is. They heard the word and they thought, oh, my God, narcissism, that's terrible. It's sort of the knee-jerk reaction. Narcissism, we're never going to be able to explain that. No, narcissism, that might be the silk, whatever. That might be your opportunity to get this guy a life sentence because you can now explain why he's done some of the things he's done. Because you know what? What would that explanation be? He's a narcissist, and therefore, why is it that he cuts her throat and callously goes and uses her hands? I wouldn't call him a narcissist. I would say he suffers from narcissistic personality disorder, which is a condition that the psychiatric experts recognize, and you know what else? That condition isn't his fault. But, okay, he suffers from, you know, Perrin, a very common condition. Why then does that make him, you know, able to do what he did to Ms. Smith? Well, I mean, I think people with that kind of a mental health problem are impulsive. That's antisocial, actually. Well, but I think it's also NPD, and I think it's also PTSD. You know, what's the real difference? The way these disorders impact the people who they love or who they care about are similar. PTSD, narcissistic personality disorder, borderline personality disorder. Why does the PTSD one, why would people be willing to accept that as somehow being mitigating? Because you see that a lot. Boy, I mean, but don't you see the danger? If you try to liken this man to somebody who served in combat in Vietnam, can you imagine? I'm not arguing that. Heaven forbid, for the defense, you have somebody who actually did a tour or who lost a relative there. I mean, you talk about dangers. I hear you. I'm making that point to you as a judge, knowing that these two things are not really all that different. I'm trying to envision thinking this through. Okay, so what do you say to the jury about why he's a narcissist, ergo he did this horrible thing to this woman? It's hard to see that. He developed this disorder, this mental health condition, this serious mental health condition because of his upbringing, because of the abuse and the neglect he suffered as a young boy, beginning with that childhood-induced alcohol substance abuse problem that in itself was abuse that his family permitted him to endure. That all, and the trauma, the murder of the father, the death of the grandmother, the beloved grandmother, then being sort of left to fend for yourself at age 11. I mean, come on, age 11, fend for yourself. How do you numb your pain? You drink and you take drugs at age 11. And so what happens to people who do that when they don't have the love and the emotional support that we all had? They develop these kinds of mental health conditions that Grady Brinkley developed. They're tough things, and those kinds of mental health conditions can cause you to hurt people you love, but the development of those mental health conditions isn't your fault. It's not your fault. It's because of how you were raised. That's what an effective counsel has to do, get up and fight. That's your job. I think your point is strongly put forward. I'm thinking it sounds like what your standard is is a brilliant lawyer as opposed to a pretty good lawyer. I'm not sure that's the standard. I mean, some folksy lawyer who's pretty good at winning cases could say, you know, that's not the strategy that's going to win with the jurors in my jurisdiction. You know, I've been a lawyer for 20 years or whatever it's been, and my evaluation is that we're better off doing this than getting into this intellectual stuff that brilliant lawyers like you could articulate very forcefully. I'm better off doing it my way, and it's a defensible way. You could say the Sixth Amendment requires that you have the most brilliant advocacy, but that can't be the standard. I'm hardly brilliant. This doesn't take a brilliant lawyer. Take somebody that cares. That's what it takes. You've got to care and still think that way. You could work hard and still think that way. Your Honor, I don't think this record shows you've got lawyers that care. I just don't think you've got that record here, and that's why I think the performance prong goes our way, and I think the prejudice is there. If you tried, you could have convinced one person. And you know what else? If you were prepared and you were prepared to do that, you would have picked a jury that would have known about substance abuse coming up, that would have known trauma was going to be part of this, that would have known narcissistic personality disorder was going to be discussed. You would have had your whole case revolve around these issues, and you would have had a jury that was ready to think about those issues. And if the standard is I just have to find one of these people, these good people who are... The same jury that he was open with before. Well, sure. But effective counsel have a duty and a warrant here to think about. The other thing that ever happened, they had no idea what their mitigation was going to be. The mother loves them. Okay, come on, please, that's the best you got. Some cases it might be. But not this case. This case you had a lot more. I really do think you do, Your Honor. I think we got your argument. Thank you. Good afternoon, Your Honor. My name is Jocelyn Lowe. I'm here on behalf of the warden. And I'll begin. I'll address Mr. Sweeney's points in reverse order. So I'll begin. Well, I mean... Unless you... Could we get this standard? I mean, it's nice to know our standard or, you know... The standard of review. As we're thinking about the merits, so... Yeah. I believe of our presiding judge. Your Honor, I think that as we've set forth in our briefs, the appropriate standard in this case is not de novo review. It's a deference to the Ohio Supreme Court's decision. The Ohio Supreme Court was presented with this claim. They were presented with a claim that counsel were ineffective in their mitigation presentation. And what they found, they held that counsel could not be faulted for not presenting additional mitigating evidence because the record does not disclose that such evidence was available. They further said, the record establishes that counsel fully inquired into Brinkley's background and consulted appropriate experts. In this case, the trial court record included that his defense attorneys had hired an investigator, a psychiatrist, and a psychologist. So they had two mental health experts as well as an investigator. In addition, before their mitigation presentation, the attorneys informed the judge in chambers that they had consulted with the experts and had made a determination after consulting with those experts that they were not going to present evidence of a mental defect or mental retardation. So there was evidence within the record that made this a proper claim to bring on direct appeal. And the rule... I think that part of the confusion over the de novo standard is that there are two types of res judicata in Ohio. There's a res judicata for a claim you could have or should have raised but did not. And there's res judicata for a claim that you did have... that you did raise previously and that has been decided on the merits. That's the type... The latter is the type of res judicata that the appellate court in this case applied because that's what they say that in the appellate opinion, the district court... I'm sorry, Ohio's district court says, this claim has been presented on direct review and it's before the Ohio Supreme Court. His post-conviction proceedings and appeal were done before the Ohio Supreme Court had issued its decision. So we know that they considered the claims... the second, third, and fourth claims of claim 11 in the petition... in the habeas petition, excuse me, to be the same as the claim that was presented to the Ohio Supreme Court. But they were wrong about that in the matter of Ohio law. If they were wrong about their res judicata as a matter of Ohio law? They were wrong about which kind of res judicata they were talking about. They just characterized it in a way that was inaccurate. And so that they're... Are you saying that they're just... their determination that the procedural bar prevented him from raising his claims is completely wrong? The res judicata, which I'm seeing, they're probably very closely related, but they have different effects for procedural default purposes and so forth. Yes, they do. Okay. So you might in your... But the collateral trial court doesn't really need to distinguish that particularly in order to decide if it's res judicata. If it's either one, they lose, right? So they could just say ambiguously, res judicata means you don't win on this and not be clear which one they're talking about. They could. We need to know later which one they're talking about, but they don't need to in order to decide the case, right? You're correct. They don't in order to decide the case. That's what I'm saying. So if they just said it, but said it wrong, for their purposes, that would be harmless error, right? So we really ought to be somewhat free in second-guessing which kind they're talking about by looking at the nature of Ohio law, shouldn't we? I think I understand your question, and I'll try to answer it, and you'll correct me, I'm sure, if I'm wrong. If they were wrong about the type of res judicata that they were applying, and so we would look at the claims that were presented in post-conviction to see if they were properly dismissed, that still supports the res judicata application in this case because in order to overcome a res judicata bar, the defendant needs to not just present additional evidence, he can't just add some affidavits, he has to present additional evidence that demonstrates he could not have brought the claim in direct appeal, and that was not the type of evidence presented in this post-conviction relief petition to the state trial court. Because he chose to present the claim on direct appeal, he has to show that it was not reasonable to do so, that he needed to have this additional evidence to support his claim. So the additional evidence would be like testimony of the lawyer or something like that? It's usually affidavits in order to overcome the initial bar and be entitled to a hearing or discovery on the case.  They go to the claim, that support the claim and demonstrate that they could not have been brought as part of the record. And the problem that Mr. Brinkley faces is that the affidavits he did present are cumulative to the evidence that was presented during the trial. I think it's... For example, something that wasn't cumulative, it would be something, some kind of evidence of the strategic thinking of the lawyer or something that he wouldn't be able to raise on direct appeal, is that the idea? I think it's... I think more typically what you would see is something more akin to a Brady claim, evidence that he could not have found, or... I think it's difficult to... Typically when we at the federal level decline to hear things on the direct appeal, it's because you don't really know whether it was ineffective assistance of counsel unless you ask the lawyer why he did it, why she did it. I would think that would be something that you wouldn't... Well, not necessarily... The alternate being the type of res judicata, the second type rather than the first type. I think that would be difficult to do in this case because the attorney said on the record that they were making a strategic decision and under Strickland, they don't need to explain the full thinking behind their strategic decision. As competent counsel, they made a strategic decision not to present this. If this were a case where they had not conducted a... They made that testimony at the collateral stage? They made it at the trial stage, Your Honor. I mean, when did that come up in the trial stage? Before the mitigation presentation began. They stated on the record that they had consulted with experts and had made a decision not to present mental health testimony. Did they say why? They did not. That could be crucial, couldn't it, in an ineffective assistance of counsel claim? It could be in a case where you didn't have other evidence that they had conducted an investigation and in this case they had retained at the services as three separate, an investigator and two mental health experts to support their investigation. The type of claim... For instance, in this case, if they had been asked the question, which wasn't relevant at that stage, I understand, but if they had, they could have said, we didn't do it because we thought narcissism would be a turn-off for the jury, one answer. Or they could have answered, would have been good, but we thought the other one was better and it was hard, in his words, all right? And because it was hard, we thought, you know, we didn't have enough time to fool with it, we'd be better off interviewing the mother or something like that. But those two answers would be real different, right, for purposes of whether there was ineffective assistance of counsel, wouldn't they? But you really don't get a chance to ask those questions until collateral review, right? That's why I'm wondering how you can say that it was all for them at the direct appeal level. It just seems counterintuitive a little bit. Because under Strickland, they're entitled to a presumption, or we make the presumption, even on a de novo review, that their performance was competent. But it's rebuttable. And it is rebuttable. Didn't they need some of this evidence to rebut? I mean, how are they going to rebut, you know, just based on the trial record? They can't rebut. That's just establishing the presumption. I agree, but the evidence presented did not rebut the presumption. Which evidence? I mean, the evidence that he presented in the post-conviction and in the ABA. So I guess, I mean, here's my question. He could not have presented that evidence in the direct appeal, correct? Correct. Okay, so this is his chance to rebut. And he diligently tries to present this on post-conviction. And he gets the bum's rush. Res judicata. We've already done this. So when is he supposed to have a chance to present this evidence to rebut? Well, I'll nitpick about whether or not some of his evidence was diligently presented. But his chance was, in post-conviction, had he met the standard of providing evidence that rebutted that presumption, res judicata would not have been properly applied. So are you saying the res judicata thing is an implicit merits determination of Strickland's claim? Well, in this circumstance, because what the court did, the court did not say, you've never presented this before. They said, this is the same claim with cumulative evidence to that presented in the trial court. And in order... I'm sorry. No, go ahead. Finish your sentence. In order to determine that he was presenting the same claim, and for the trial court to make a determination that this evidence is merely cumulative to what you presented at trial, they have to look at the merits of the evidence. They looked at the affidavits provided by his mother, his aunt, and his cousin, and said, you're presenting the same claim to us. It's cumulative to what you presented at trial. Is there any case you can point us to where either our court or the Ohio courts similarly determined that a raised judicata decision on appeal was implicitly a merits determination of the underlying claim? A raised judicata determination? I mean, here you're saying that the raised judicata rejection of his IAC claim in post-conviction. Correct. You're saying, as I understand it, that that rejection was, in fact, an implicit rejection on the merits, right? Right. Which I guess then kicks in 2254 D or B, whichever one it is. I cannot point you to a case where you directly said that it is implicitly a merits determination because I think a number, and I did review to look for cases, I think Williams v. Anderson, which is 460 F3rd 789, is the closest that I found to answering that question because usually what happens is the raised judicata bar is applied because it was not raised on direct appeal. It could have been either that or we've already done this once. Right. So it's a unique circumstance to have that raised judicata because you could have raised it on direct appeal bar. And the appellate court, which is why we don't get de novo review in this case, the merits determination was made by the Ohio Supreme Court and that's what the district court judge found as well was that claim 11A was raised and decided by the Ohio Supreme Court, claims 11B, C, and D, the second, third, and fourth parts of his ineffective assistance to counsel claims were raised and rejected as raised judicata because they had already been raised to the Ohio Supreme Court. So are you saying we have a merits determination on B, C, and D? By the Ohio Supreme Court. Because of the first? Yes. Because they're simply a different way of stating the same claim, which is that he is unhappy with the mitigation presentation that was made. But, I mean, you're familiar with the Shepard case, we just had come out, right? Yeah. I mean, this cuts both ways, you know? In that case, they want to tweak their theory a little bit and add some, rely on some transcripts that were not around in the state court. Actually, were not around, I'm starting to forget the particulars, right? But we said that part of the claims he wanted considered on Rule 60B were new claims because he relied on different evidence than the evidence that the district court adjudicated the first time. Why wouldn't that apply here? I mean, it's the same principle. It's got to go both ways, right? I mean, obviously, he's relying on different evidence in the post-conviction proceeding than he did in the direct appeal. Why wouldn't we say, for AEDPA purposes, that's a different claim and therefore, at least, the Ohio Supreme Court's decision is not an adjudication of that claim? I think it's the difference between the application of Ohio's race judicata law and the AEDPA deference standard. So his claims, 11B, C, and D, were presented in post-conviction and were rejected for having already been raised in the Ohio Supreme Court. And that's how Ohio applies their race judicata law. These are claims that are the same in Samaritan's Determination. Your evidence does not change that standard. You do not have... Basically, you don't have... Your evidence isn't meeting that standard versus the AEDPA standard of you've not presented this evidence to state court and all you're doing is changing. Well, I guess that raises an interesting situation then because, as I understand what you're saying, and I know this stuff is, like, you know, complicated, but what you seem to be saying is the Ohio Court of Appeals says, as to B, C, and D, same claim that you lost on with 11A. However, what I'm suggesting is that for AEDPA purposes, not the same claim. And so now we have, you know, the state court saying that the adjudication of the A claim counts as a merits adjudication of B, C, and D. Correct. When, you know, according to our standards, they're different claims, and so the adjudication of A is not an adjudication of B, C, and D, which means, you know what, state courts? I mean, your rules can be whatever they are, but the claim was presented to you in the only way it could have been presented because it couldn't bring all this evidence in the direct appeal. And for your own reasons, you chose not to address it on the merits, you know, based on that evidence. So somebody's got to look at this sometime. But I think I understand, but there is case law out of this circuit saying when the Ohio courts reject a claim because it's res judicata, as having already been presented, we're not in a procedural default situation, we're in a previously determined merits situation. Sure, I believe they have said that. No, not at all. I think that's right. Right. I can think of cases where that would clearly be right. For instance, if on direct appeal they said this was not ineffective assistance of counsel because, for instance, you're raising a claim that has no merit under our law. Right. And if they said that, then you come on collateral review and you raise the same ineffective assistance of counsel claim, they wouldn't say you failed to raise it, they'd say you raised it, we resolved it, or the higher court resolved it, and I'm not going to resolve it again in that case. I think there are cases more or less like that that have just said that's, you can still go on habeas and make that argument because you presented it and it was a merits thing and all res judicata said was that it's already been decided, which is different from you never raised it, right? Exactly. That's another aspect of you never raised it. But the trouble with doing that analysis in the context of ineffective assistance of counsel is that generally speaking, in order for your ineffective assistance of counsel claim to have some oomph, you've got to have some testimony as to why the lawyer did or didn't do something, all right, so that it makes sense only in limited cases for an ineffective assistance of counsel case to be brought. And thoroughly disposed of without a further chance at it at the direct appeal level because you may be able to show some things, divorce the record, later on, right? So that's why he's treating these as sort of two different claims. It doesn't really answer that to say that certain types of claims, you can't do that. But the distinguishing factor in this case is that the decision to raise this on direct appeal was a decision made by his appellate counsel with full knowledge of Ohio law that he would not be able to raise this claim again in post-conviction. The Ohio law is such that you can raise it both times. He can raise it... As long as there's more evidence. Not simply more evidence. Different kind of evidence. Yeah, I mean... The kind of evidence you couldn't bring before. He has, in order to overcome res judicata, and it's Stacey Lawson, to overcome the res judicata bar, the evidence outside the record must demonstrate that he could not have appealed the constitutional claim based on the information in the original record. Mr. Brinkley's direct appellate attorney determined that he could raise and should raise the claim on direct appeal based on the evidence in the record. And the claim of ineffective assistance of appellate counsel, direct appeal counsel, was raised and rejected by the district court. It seems like we're starting to... I mean, if this is right, it seems like we're holding these people to an impossible standard. So, I mean, I guess you're saying the fatal mistake was bringing this into direct appeal. I disagree that it's a fatal mistake because I think the proper place to bring it was in the direct appeal because these lawyers had put in the record that they were making a decision not to present mental health evidence. And because they then presented a substantial mitigation case about Mr. Brinkley's background with knowledge of their interactions with Mr. Brinkley. They were opposing their chance of cross-examining the lawyers and getting them to admit that they did it because they were lazy. Right, but that's... Or they just forego that and Judge Ketletz is suggesting that... But when you look at the... They were wrong to do that. But when you look at the evidence that was presented to the post-conviction court and to the habeas court, they were not wrong to do that because the evidence supports the determination that they made to limit the mitigation evidence presented to the presentation of Mr. Brinkley's mother and aunt and sister and his unscorned statement presenting him as a family man who needed to be around to support and provide for his family. The evidence in the post-conviction record is cumulative of that and the narcissistic personality disorder I certainly don't need to get into the fact that it's not a strong mitigator. It's a very... It's a substance abuse. The substance abuse mitigator is always a double-edged sword. I don't have that. Well, go ahead. I think the substance abuse mitigator and there's a case on my brief that says this is a double-edged sword because you're talking to a jury that may not be sympathetic to the fact that you have been drinking. He found out that he had substance abuse, though? I mean, they didn't even find out, right? I don't think it's in... There's no way which side of the sword is sharper without knowing that it's even there. There's no evidence in the record that they didn't know about his substance abuse issues. I mean, number one, Mr. Brinkley is certainly the person most able to inform them I've been drinking and using cocaine. He has all kinds of convictions. Am I mixing that up with another case? He has a number of convictions, but his convictions are for violent offenses. He's been in and out of prison the majority of his adult life, even before this, as a child. But his family members, when they talked about his substance abuse issues, it's not a sympathetic case. As a result of his substance abuse issues, his mother says that she had to cash in her life insurance policy to pay off drug dealers who were coming after him and his family. That's one of the reasons that she decided to turn him in and file juvenile charges on him. That's in the testimony that... That's not in her direct testimony. And I apologize, I don't remember offhand if it's either in her... I believe it's in her affidavit to the post-conviction court. She mentions that there was a $3,000 debt and in order to pay it off so that his family members, his wife and children, would be left alone, she cashed in her life insurance policy. It doesn't paint the picture of a sympathetic individual. And it ties into the state's case, the specifications being escape and theft and the state's theory that Mr. Brinkley killed Shantae Smith not because he was a jealous lover, but because when he sat in jail two weeks before this murder, he said, I'm going to get her. I'm going to get her to pay my bond. I'm going to kill her and I'm going to leave town. And Dr. Brams and both Dr. Smith say that he comes across as manipulative, that narcissistic personality includes feeling entitled and using people. He bragged to Dr. Brams that he manipulated women and got them to pay his bills for him. So this evidence of his substance abuse completely plays into it. And the evidence of his... The argument, just so I'm clear, the argument you're making now goes to the second part of the argument having to do with... Yes, it does. I'm sorry, Your Honor. The merits... Yes. The merits to Novo or... The seamless transition. I didn't have to watch for those scenes. It does go to the second part, to the merits review. But I think it supports the idea that his direct appellate... The decision to present this on direct appeal did not tie Mr. Brinkley's hands and he's not entitled to the Novo review because there was a merits determination. But even if... The opposing counsel makes a strong argument that just relying on the family was just not trying very hard. And... If you tried real hard, you could come up with a forceful argument that had some teeth to it. I mean, can you respond to that? Yes. And there's always going to be hindsight and there's always a different mitigation theory to present. In this case, his attorneys didn't just put on Mom and say, Hey, Mom, tell us how much you love him. On the record, the prosecutor mentions that the courtroom was very emotional that morning and lots of tears were shed. The prosecutor says that in his closing statement to the jury. There's a 10-minute break taken during the mother's testimony where it's clear that she stopped mid-sentence and the depositions afterwards, both attorneys described that the entire courtroom was in tears. Mr. Brinkley says from his seat at defense bar that he loves his mom. I love you, Mama. And thanks his family members for coming. And in his own unsworn statement, reiterates the theme that his attorneys have taken, which is that he's a loving family member. He has four children. He has nieces he wants to love and support. He picks up that same theme. I would also note that at his sentencing, he says his story changes. And when he is sentenced... Remarkable transcript. I'll give you that. Yes. In his sentencing, he thanked the prosecutor, the judge, and his attorneys at the end of his mitigation presentation. When Mr. Brinkley returns for sentencing, he says that he did not grow up in poverty. He did not grow up in the projects. His attorney told his family to say that. His sister has no idea about growing up in the projects. And then says, quote, I had a beautiful childhood. I was raised by beautiful people. That's completely contradictory to a theory of childhood trauma. And a person who grew up with underlying substance abuse issues, it's unusual that they would describe themselves as having a beautiful childhood. And it points to the fact... At the sentencing, he says that his attorneys told his family... After the jury has voted to sentence him to death... Advise. Advise, yes. The judge actually delivers that. Yes. Before the judge has handed down his sentence, the judge asks him if he would like the opportunity to say anything. The judge can reject the jury's... Correct. They can. And before the judge has pronounced his sentence, he says, I didn't grow up in poverty. My attorney told my family to say that. And, quote, I had a beautiful childhood. I was raised by beautiful people. And so completely discards the theory that if there was any sort of childhood trauma... Well, I mean, what do we do with that? I'm not sure that... Do we say, okay, therefore what he said is true and this wouldn't work? Or, I mean, it's bizarre. I don't know what we're supposed to do with that. I mean, it's a bizarre statement. I'll grant you that. But it also points to the Strickland... Why we have the Strickland standard is because at the end of sentencing, he's unhappy with what happened and completely discounts it. And there's always going to be... You know, now that the sentencing... That's why it's so bizarre. I mean, I can see why somebody who's caused all this harm to his family wants to do something to palliate it at the end and doesn't want them to think that they're responsible for his crimes. But he doesn't just say... That shows that substance abuse wouldn't have made the jury more sensitive. I mean, I can see how it affects that, really. I agree. His unsworn statement is completely contradictory. His unsworn statement is in line with this loving family, loving provider theory. A substance abuse problem that manifests itself like his did, resulting in deaths, resulting in a number of criminal convictions, undermines the idea that this is a man who needs to be around to provide for his family. That's the theme repeatedly presented by these family members. Please don't take him from us. Please don't take him from us. We love him. We need him. He needs to be here as a support for us and our children. And he repeats that. He says, I love my wife. I love my four children. I want to meet my niece. I want to be around for these people. I think at one point he asked the jury, you know, you're going to do what you're going to do. Just don't take me away from my mother before she passes. So to then get up and say, none of that was true, after you've repeated the same theme, I mean, the importance of the Strickland standard is not to get up here and second guess the decisions that those attorneys made based on their reasonable investigation, their discussions with his family members, their discussions with Mr. Brinkley, and their discussions with experts, and say, well, you know what? It might have worked better. What might have worked was this. The point of Strickland is to prevent continuously retrying these cases with what might have worked differently or might have worked better, and why we give deference. The investigation point, I mean, specifically, you've heard Mr. Sweeney explain why he thinks it was inadequate. I mean, specifically, I know you did it here, but just, again, why do you think the investigation was adequate? Okay, in addition to the three-hour trip, three or four-hour or five-hour trip to Chicago to visit with family members that you mentioned, his attorneys also spoke with family members on the phone. They presented a number of family member witnesses, and on the record, even just limiting it to the record review, it's apparent that they're aware, in depth of his background, they're aware that he was raised by a young mother, that his father died very young, and you can see in the transcript that they tried to get into evidence that his father was stabbed to death by his father's girlfriend's or father's sister's boyfriend, I believe, and they know about his background. The only evidence that they can point to as his attorneys not having found is a set of high school transcripts from a high school that he only spent a short period of time at. There's no other school records provided, even in the habeas case, and Dr. Amder's report. Dr. Amder's report was available in post-conviction, but was not provided to the state courts, and Dr. Amder's report is the only expert report that mentions organic brain damage and is based on a one-hour interview for a disability claim. What about the psychological stuff? Why was there an adequate investigation, in your view, there? They spoke with Dr. Brands and one of the doctors, Smith, and I don't remember offhand if it's... I really want to get specific. Who's they? His attorney, Attorney Deck, I agree, led the mitigation investigation. He did work with Attorney Seibs, but they both testified in habeas that after the jury returned a guilty verdict, Mr. Brinkley refused to speak to Attorney Seibs, and that's why Mr. Deck led the mitigation development. Well, presumably, they were doing something before the guilty verdict comes in? They are. They're doing their investigation. They have an investigator. I guess so, but Deck is the lead lawyer on mitigation, correct? That's my understanding, yes, Your Honor. All right. So Deck talks to Brahms or whatever?  And does Deck talk to Smith as well? Yes, Your Honor. What does that mean? Can you spell that out more? How long did they talk? I mean, they meet? I don't know if there's information about how long they talked, but when they are deposed, Deck and Seibs both described being aware of this mental health issue and deciding that they were not going to present expert testimony because it would open the door to presentation about Brinkley's convictions, his previous convictions, which are violent and brutal. Not only would the narcissistic personality disorder play into the state's theory behind this murder, they described worrying that it would give the jury additional reason to sentence him to death, not to sentence him to life, and that's why they make a strategic decision not to do it. And they don't just speak with experts. They obtain school records. They obtain medical records. They obtain his previous prison records. Inmates at Mr. Deck and Mr. Seibs with their investigator. Both of them are involved in reviewing this and making a decision and speaking with other attorneys about a mitigation presentation and making the decision that, based on their investigation and the kind of convictions that he has, which includes a previous juvenile charges for theft, disorderly conduct and burglary, and 1984 charge for race and deviant sexual assault where he vaginally and anally raped his girlfriend with a screwdriver. An armed robbery within one year of his parole from that rape conviction and then a theft conviction within one year of being paroled for the armed robbery where he mugged three people at gunpoint and then was convicted of theft when he was paroled. They didn't want to get into that type of criminal record. At what stage of the proceedings does it come out that they didn't want to get into that? That's in the habeas. Yes. When they're deposed in habeas, they discuss that they knew the state had this evidence because the state provided them. Federal habeas. Federal habeas. That they knew the state was aware of his convictions and the background of his convictions because the state had provided that information to them. They were provided, in discovery, his previous convictions and were concerned that putting an expert on the stand, one of the questions the prosecutor could ask is, what's the basis of your expertise? Part of the basis of that expertise would be a review of his criminal record which included these convictions and didn't want to open the door to that. There is documentation. If a de novo review is conducted in this court, we're to find that he was diligent and therefore is entitled to the evidentiary development he did in habeas court that they did conduct a reasonable investigation. This is not a case where they simply sat on their hands or said it would be easier to just talk to mom and we don't have to do anything else. They did look for this evidence. You agree that we should consider the testimony in the federal evidentiary hearing? No, I do not. How do we bring in all this stuff we just talked about? You would only consider that evidence if you found that he was diligent in trying to present it to the state court. Some of what you just cited is, I guess in your view, favorable to you. The testimony of the lawyers, right? Yes, it would be favorable. I believe that the review, if the merits determination in the Ohio Supreme Court is set aside because he was not diligent, review should be limited to the affidavits presented to the state's post-conviction, the state court in post-conviction. And the reason that that shows that they made a reasonable investigation is because those affidavits are cumulative or irrelevant in some cases to the evidence presented at trial. There's no demonstration of evidence that they should have been aware of but were not, especially given that they had two mental health experts  Okay. Okay. Thanks. Thank you, Henry. Thank you. Please, the court, just to respond to the points Ms. Lau made. Remember, this was a case where the jury came back in 30 minutes for death. Okay. So I think that speaks to, I understand that there may have been  and there may have been some emotions, but I don't think that that speaks to But the fact of the matter is the jury simply did not, was not persuaded in any way, shape or form by what happened here, which is I think... Doesn't mean it's the lawyer's fault necessarily. It may not. I can only imagine what it must have been like to hear this 911 call, to hear the mother describe what it was like. I mean, I'm not trying to make it difficult for you, but that is, it's not sort of taking unfair advantage, I think. It's part of what the jury heard. And so as we evaluate prejudice, I mean, that's a big part of it. I mean, one can only imagine. I mean, the mother going in and sees her daughter like that. I agree. And they heard that. I agree. There was some emotion in this courtroom. But I think in evaluating prejudice and performance, I think you have to put that in the perspective of what the case was going to be. And that was going to be the case. You were going to hear that mother in that 911 call. And so why in the world would you even think that having Grady's mother say she loves him was ever going to be enough? To me, that's obvious enough. That's a dead-bang loser, if that's your theory. If you go in thinking that's going to work, you're not thinking very clearly. Because that's never going to work when you listen to that 911 call. That's just sort of, I just think that's so obvious. I mean, come on, that's obvious. You can't go in thinking that's your winning theory. And so you had, what did you have? I think the assistant AG is mistaken. I don't believe the evidence supports the notion that Deck or Thieves had any idea that there was narcissistic personality disorder that was capable of being diagnosed. That simply is not in the record. Now, what I think is in the record is that Deck and or Thieves knew and testified in their depositions that they had heard the word narcissism from Jolie Brahms. That's in there. And that they had heard that, you know, this might be difficult. That's in there. But the actual existence of a mental health diagnosis on Axis II by a competent professional who had examined this person, they had no knowledge of that. They were ignorant of that. Deck's notes of meeting with Brahms say narcissistic psychopath. I mean, he doesn't have to spell it out in DSM terms. I mean, how do we say, no, he didn't know. He didn't do enough to know he was a narcissist. No, but here's what the testimony was. Jolie Brahms said, I spoke to him. I hadn't diagnosed anything. I may have said those words. I hadn't come to any diagnosis yet. I had not come to any diagnosis yet. That's her testimony. That's the truth. She didn't have enough to work with. She had just started. As she said, I had just scratched the surface. I saw some things that made me very, made this, presented to me a case that's going to be very difficult. There's a lot of challenges, but there's a lot to work with. She saw the attachment problems, the attachment issues he had. She saw the issues of the potential organic aspect of it. All of that, she saw. She's a very skilled professional, and she would have been able, had she been given the chance, to come up and present evidence and mitigation, but she never was given that chance. But that testifies that Brahms told him that Brinkley's mental health background would have been better for the prosecution than the defense. I don't believe that's Brahms' testimony. Right, but that's what Dex said. I think that's what Dex said. What do we do with that? Let's say Dex's right. Then you've got a lot of trouble here. I don't think so. I don't think so. Your Honor, then you go find another expert. You find somebody who's going to tell you what we know about this guy, which is that he's got a mental health condition that the jury needed to hear about. That's what they should have done, if that, in fact, did happen. They didn't do that. Well, maybe they did. They got Douglas Smith. What did they do with him? He was actually an MD psych. What did they do with him? They made a judgment, according to them. They made a judgment that calling, I mean, when you call somebody a narcissist, it usually doesn't make the listener like that person more. Your Honor, but I don't think they made a judgment as to Douglas Smith. I mean, the evidence is, I think, unrefuted that what happened with Douglas Smith is that they spoke to him, that Deck did, asked him to go meet with Brinkley. He met with Brinkley for four hours or so and was prepared to begin to put a report together and never heard back. His next communication with Deck, he called him and said, what's going on? And Deck said, oh, this case is over. He already testified. That's it. There's no judgment there. There's no judgment there. There's no communication there. Deck never even knew what Smith did. This, again, that's why I made the point about this being his first capital case. You got a guy, Doug Smith, this is his first capital case. He's a psychiatrist. He could potentially help you here and you put him on this project and then you let him go and you never talk to him again. That's what Deck did. That's the fact. I don't think that's refuted. I don't think that's even questioned as being accurate in terms of what happened here. So if that's what happened, that speaks to you. Why? I mean, that's really the nub of this. Was it a considered judgment that, you know what, this psychological stuff's just not going to help us in this case? I mean, I know you disagree with the judgment, but if it was a judgment, then that's one thing. If it was he just stopped working, that's another. I think the inference could be that. But even if the argument is that you made a judgment, I would argue, particularly with respect to Jolie-Brahms, that was an uninformed judgment because Jolie-Brahms herself testified. I just scratched the surface. How can you make a judgment when your psyche had only scratched the surface and wasn't even prepared to make any kind of diagnosis or do anything like that? That's what happened here. That's a critical breakdown because I do think that the mental health aspect of this, coupled with the substance abuse, coupled with the trauma, coupled with the potential organic aspect, coupled with the family that loved them, because you don't leave that out, it wouldn't have mattered if your target, if your standard isn't all 12 people but just one people, one person. That's all you need. You could have met that standard. And so you have 30 minutes for death. You know, you didn't come close. You didn't try. You didn't do what effective counsel should have done. Let me just say a couple more things about the res judicata. Maybe I don't have the time. I would ask the court to look at the Herring decision. We filed a notice on that yesterday night. It's a Supreme Court decision out of Ohio, and it's a case where Herring raised in direct appeal the ineffective assistance of counsel in mitigation. It was rejected on the merits. He then went into post-conviction and raised it again with more evidence, just like Brinkley did. Herring ultimately got relief. The Ohio Supreme Court in the second Herring decision, which just came out not too long ago in 2014, granted him relief, and it did so because Ohio's res judicata principles would never bar that type of a claim. You get relief on those claims, and so the state courts that looked at Grady's case got these res judicata rules wrong. And so this court's review is de novo. This court's review is de novo, and that puts us in a situation where you can look back to all of these decisions this court has made where relief has been granted in cases like this because performance and prejudice is met. We recognize as capital lawyers that we lose a lot of these cases, but we lose because of 2254D in a lot of these cases. But this case isn't one of those cases. This is a case where if de novo review is applied, it's a strong case of ineffective assistance. Even if you were to conclude that 2254D did apply, we would still prevail because the state court's decisions would be unreasonable. Okay, counsel. I think we understand your argument. Do you have further questions? Thank you, counsel. Thank you. We appreciate your advocacy from both of you. It's a difficult case, and we'll take it under consideration. Thank you very much.